UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MATTHEW A. GOODMAN,

        Plaintiff,

v.

NANCY A. BERRYHILL,

        Defendant.

CASE NO. C17-5115 BAT

**ORDER AFFIRMING THE COMMISSIONER'S DECISION AND DISMISSING THE CASE WITH PREJUDICE**

Plaintiff Matthew A. Goodman appeals the denial of his application for Disability Insurance Benefits. He contends the ALJ erred by (**1**) failing to consider that the time he spent in medical treatment would not allow for consistent workplace attendance; (**2**) failing to consider the combined effects of his medical impairments in the same manner that the Veterans Administration ("VA") did when it found him to be disabled; (**3**) summarily rejecting his assigned Global Assessment of Functioning ("GAF") score; (**4**) failing to consider one of the two lay statements submitted by his wife and failing to assign weight to either statement; (**5**) failing to explain adequately why the non-examining physician's RFC assessment was discounted; (**6**) posing hypotheticals to the vocational expert ("VE") that did not account for all of his limitations; and (**7**) relying on job information from the VE that was not supported by substantial

ORDER AFFIRMING THE COMMISSIONER'S DECISION AND
DISMISSING THE CASE WITH PREJUDICE - 1

evidence. Dkt. 10, at 2. As discussed below, the Court **AFFIRMS** the Commissioner's final decision and **DISMISSES** the case with prejudice.

**BACKGROUND**

Mr. Goodman applied for a closed period of disability from **February 23, 2013** to **June 8, 2016**, because he returned to work at the level of substantial gainful activity on June 8, 2016. Tr. 72; Dkt. 10, at 4.[1] Mr. Goodman served 13 years in the United States Army, which included eight combat deployments. Tr. 63, 189, 330. He is currently 34 years old, has a GED, and while in the military served as a combat rifle crewmember, heavy truck driver, laborer (stores), and tank truck driver. Tr. 77, 88–99. On February 23, 2013, he returned early from an Afghanistan deployment due to injuries he sustained while deployed and was assigned until his discharge to a Warrior Transition Unit, at which his only responsibility was to attend medical appointments. Tr. 61–62. He underwent four surgeries to address back injuries, one in 2006 and three in 2013. Tr. 59; Dkt. 10, at 3. Mr. Goodman was discharged in August 2014 and was eventually determined to be 100% disabled by the VA. Tr. 243, 318. After military service, Mr. Goodman engaged in several unsuccessful work attempts until his successful employment at the Rescue Mission in June 2016. Tr. 65–70.

The ALJ held a July 2016 hearing and issued a decision in October 2016. Tr. 24–43, 49–86. The ALJ found that during his closed period of disability from February 23, 2013 to June 8, 2016, Mr. Goodman had the following severe impairments: post-traumatic stress disorder ("PTSD") with traumatic brain injury ("TBI") and headaches; degenerative disc disease of the

---

[1] At the hearing, plaintiff's counsel stated that the closed period ended on June 6, 2016. Tr. 72. There is no dispute, however, that the closed period actually ended on June 8, 2016, when Mr. Goodman began employment at the Rescue Mission. *See* Tr. 24; Dkt. 10, at 4.

ORDER AFFIRMING THE COMMISSIONER'S DECISION AND
DISMISSING THE CASE WITH PREJUDICE - 2

cervical spine; and lumbar spondylosis with radiculopathy status/post three surgeries. Tr. 27–31. The ALJ assessed residual functional capacity ("RFC") as follows:

> [C]laimant had the residual functional capacity to perform **light work as defined by 20 CFR 404.1567(b)** during the alleged closed period from February 23, 2013 to June 8, 2016. This is work involving the lifting of no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time, with some pushing and pulling of arm or leg controls. He can climb ramps or stairs occasionally, but never ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, or crawl. He can occasionally do overhead reaching bilaterally with his upper extremities. He can have occasional public contact. He can do unskilled work. He must avoid concentrated exposure to vibration and workplace hazards.

Tr. 34 (emphasis added). The ALJ found that Mr. Goodman could not return to his past work, but that he could perform several jobs that exist in significant numbers in the national economy: production assembler; assembler, electrical accessories; and cleaner, housecleaning. Tr. 42–43. Because of this, the ALJ found Mr. Goodman to be not disabled. Tr. 43. As the Appeals Council denied his request for review, the ALJ's decision is the Commissioner's final decision. Tr. 1–6.

## DISCUSSION

The Court will reverse the ALJ's decision only if it was not supported by substantial evidence in the record as a whole or if the ALJ applied the wrong legal standard. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). The ALJ's decision may not be reversed on account of an error that is harmless. *Id.* at 1111. Where the evidence is susceptible to more than one rational interpretation, the Court must uphold the Commissioner's interpretation. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

Mr. Goodman contends that the ALJ erred by: (**1**) failing to consider the frequency of his medical appointments to be debilitating; (**2**) neither adequately considering all of his limitations nor assigning the proper weight to the VA's disability determination; (**3**) inadequately rejecting his assigned GAF score; (**4**) inadequately considering his wife's lay testimony; (**5**) discounting non-examining physician Howard Platter, M.D.'s assessment of physical RFC; (**6**) questioning the VE based on an insufficient RFC; and (**7**) relying on unreliable job numbers from the VE. The Court finds that the ALJ's decision is supported by substantial evidence and is free from harmful legal error.

### 1. Frequency of Medical Appointments

Mr. Goodman argues the ALJ erred by declining to find him disabled throughout the closed period or, at a minimum, from February 23, 2013 to August 4, 2014, because the record demonstrates that the frequency of medical treatment precluded consistent attendance at work. Dkt. 10, 4–7. The Court disagrees.

In an unpublished opinion, the Eleventh Circuit addressed Mr. Goodman's assertion:

> [W]e are unpersuaded by [claimant's] argument that the excessive number of medical appointments she attended rendered her disabled. For starters, whether the number of medical appointments affects her ability to work is not an appropriate consideration for assessing her residual functional capacity because that determination considers only the functional limitations and restrictions resulting from medically determinable impairments. *See* SSR 96-8p. The number of medical appointments she attended is not a functional limitation caused by her impairments that would affect her physical or mental capabilities. Moreover, nothing in the record indicates that [claimant] was required, or would be required, to schedule her medical appointments during working hours so that they would interfere with her ability to obtain work.

*Cherkaoui v. Commissioner of Social Security*, 678 Fed. Appx. 902, 904 (11th Cir. 2017). Similarly, also in an unpublished decision, the Tenth Circuit rejected the claimant's argument that he was precluded from work because his physician noted that post-surgery claimant would need to miss work at least three times per month:

ORDER AFFIRMING THE COMMISSIONER'S DECISION AND
DISMISSING THE CASE WITH PREJUDICE - 4

> Even if this were necessary following surgery, it does not mean [claimant] would be required to attend follow-up appointments indefinitely, nor does it mean he could not perform work on a regular and continuing basis. To be able to perform work on a "regular and continuing basis," see 20 C.F.R § 404.1545(b) & (c), one need not keep a particular work schedule. Rather, work "on a regular and continuing basis . . . means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1, 2 (July 2, 1996).

*Razo v. Colvin*, 663 Fed. Appx. 710, 717 (10th Cir. 2016).

The Court agrees with the *Cherkaoui* and *Razo* courts to the extent that the proper focus must be the functional limitations and restrictions resulting from medically determinable impairments. *See* SSR 96-8p, 1996 WL 374184. That is, the Court rejects that frequency of medical appointments alone can be considered a disabling medical impairment. Accepting such a proposition would presume disability for anyone who frequently visited a doctor regardless of the necessity of the treatment or the medical prognosis. Moreover, it would presume functional disability for those in Mr. Goodman's position in the Warrior Transition Unit whose primary responsibilities are to attend medical appointments while awaiting discharge from the military. This is not to say that frequency of medical treatment is irrelevant; rather, it means that to be disabling, the frequency of medical treatment must be necessitated by the medical condition and be substantiated by the evidence. The regulations suggest the necessity of such a linkage, for example, via Listing 6.03, which presumes disability for kidney disease *with* chronic hemodialysis or peritoneal dialysis.[2] 20 C.F.R. Part 404, Subpt. P. Appx 1 § 6.03.

The Court is unpersuaded by Mr. Goodman's narrative citation to the frequency of his medical appointments during the closed period. Dkt. 10, at 5–7 & n.2. No physician opined that

---

[2] "Under 6.03, your ongoing dialysis must have lasted or be expected to last for a continuous period of at least 12 months. To satisfy the requirements in 6.03, we will accept a report from an acceptable medical source that describes your CKD and your current dialysis, and indicates that your dialysis will be ongoing." 20 C.F.R. Part 404, Subpt. P. Appx 1 § 6.00C1.

Mr. Goodman would frequently miss work due to medical appointments. Nothing suggests that Mr. Goodman could not have scheduled his medical appointments outside of working hours such that being employed would have been precluded for more than 12 months. Moreover, the content of the medical treatment records and Mr. Goodman's own testimony contradict his assertion that the frequency of medical appointments was necessitated by debilitating impairments. For example, in July 2013, i.e., two months after back surgery, the treating nurse noted that Mr. Goodman played 18 holes of golf. Tr. 661. Similarly, on April 29, 2014, Mr. Goodman was released without limitations and stated that his goals for May 2014 included golfing three times a week, rebuilding his truck daily, scuba diving twice a week, riding horseback once a week, participating in archery once a week, glassblowing once a week, and attending a Boy Scout retreat. Tr. 542, 544. At the hearing, Mr. Goodman testified that during the relevant period he did not leave his job at Harris Transportation Company due to physical or mental limitations but because the position entailed a night shift and that such a schedule did not "fit" being a father.[3] Tr. 16.

The ALJ did not harmfully err by declining to find that the frequency of medical treatment during the closed period precluded his consistent attendance at work for longer than 12 months.

### 2. VA's Disability Determination

Mr. Goodman argues that the ALJ erred by declining to consider all of his limitations when assessing RFC, that is, to consider the limitations in the same way the VA did in making its

---

[3] The regulations indicate that a claimant is not disabled if he remains unemployed because of his wish not to do a particular kind of work. 20 C.F.R. § 1566(c)(8).

determination of disability. The Court finds that the ALJ did not harmfully err by failing to consider his limitations in the same manner as the VA.

With respect to VA benefits, the VA found Mr. Goodman to be 100% disabled based on a number of limitations, attributing predominance to mental limitations: (1) intervertebral disc syndrome with herniated disc ("IVDS"), status post laminectomy and discectomy (also claimed as low back pain), 20%; (2) posttraumatic stress disorder ("PTSD") and depressive disorder, not otherwise specified with traumatic brain injury ("TBI") with cognitive dysfunction and photophobia (claimed as bilateral eye condition), 70%; (3) lumbar radiculopathy, left lower extremity involving the sciatic nerve due to lumbar IVDS, 20%; (4) temporomandibular joint disorder ("TMJ") (claimed as bilateral jaw surgery), 20%; (5) right shoulder strain (dominant), 10%; (6) left wrist tendonitis (non-dominant), 10%; (7) degenerative disc disease, cervical spine (claimed as neck pain), 10%; (8) left foot heel spur and plantar fasciitis, 10%; (9) tinnitus due to TBI, 10%; and (10) paresthesia of the jaw status post maxillary and mandibular surgery (claimed as bilateral jaw surgery), 10%. Tr. 948–49. Although a VA rating of disability does not compel the SSA to reach an identical result, an ALJ must ordinarily give great weight to a VA determination of disability. *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). This is so due to the marked similarity between the two federal disability programs. *Id.* "Because the VA and SSA criteria are not identical, however, the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id.*

The ALJ found that the combined impact of the impairments the VA found to be disabling caused limitations that would still permit civilian light work under the standards applicable to an SSA disability analysis. Tr. 39–41. The ALJ noted that Mr. Goodman's "PTSD

symptoms, which comprise the majority of his VA disability rating, were found to satisfy retention standards." Tr. 39. In December 2013, the Medical Evaluation Board opined that "[t]he preponderance of the evidence reflects that [behavioral health] symptoms do not interfere with effective duty performance, necessitate duty limitations, or require recurrent/extended hospitalization" and that "Posttraumatic Stress Disorder MEETS retention standards." Tr. 324–25. Similarly, the ALJ noted that the VA acknowledged that a TBI screening in February 2013, the month Mr. Goodman alleged he became disabled, was negative for cognitive functioning impairment. Tr. 40; *see* Tr. 323, 952. The Medical Evaluation Board noted "there is no evidence supporting that this condition [TBI], individually or in combination impact[s] his ability to perform DA 3349 [physical profile] functional activities, significantly limit[s] or interfere[s] with his performance of duties, would compromise or aggravate his health or well-being if he were to remain in the military." Tr. 323. The ALJ noted that the VA combined PTSD and TBI into one disability evaluation of 70% even while indicating that PTSD was the "more predominant disability based on the statement from the TBI examiner that symptoms were likely due to PTSD, *but only on speculation*." Tr. 40 (quoting and emphasizing text from Tr. 953). The ALJ then declined to accept the VA's speculation because the objective and other medical evidence did not establish that Mr. Goodman's mental and physical conditions precluded him from performing all light work during the relevant period. Tr. 40. For example, the ALJ noted that while the VA assigned TBI residuals, such as headaches, tinnitus, hearing loss, speech difficulty, and cognitive dysfunction as minimal compensable evaluations—none of which preclude all light work—the record contained no neurological evaluations and very little evidence of these conditions. Tr. 40 (citing Tr. 952). Similarly, the ALJ noted that the VA acknowledged that for Mr. Goodman's PTSD and TBI, the results in the treatment records showed much less severity

than the results of a later examination. *Id.* (citing Tr. 952). The ALJ thus cited specific examples of the inconsistency between the VA's disability determination and the rest of the record. *See* 209 C.F.R. § 404.1527(c)(4).

The ALJ also cited evidence that Mr. Goodman's activities contradicted the VA's disability rating. An ALJ may discount an opinion to the extent it conflicts with a claimant's daily activities. *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 601–02 (9th Cir. 1999). The ALJ noted that in 2014 Mr. Goodman was released without limitations and had immediate goals of playing golf three times per week, rebuilding his truck daily, and participating in glassblowing, horseback riding, archery, and scuba diving. Tr. 40 (citing Tr. 542, 544). In July 2013, two months after re-do microdisc surgery, he played 18 holes of golf, Tr. 40 (citing Tr. 675); in October 2013 (less than a month after fusion surgery), he reported walking and going to the zoo as well as driving to the clinic for exams, Tr. 40 (citing Tr. 639, 643); and he regularly reported no behavioral health issues throughout the requested period, Tr. 40 (citing Tr. 651, 661, 721, 727). On his function report, Mr. Goodman noted that he could walk about a mile before he needed to stop; he had no issues with following instructions; he could pay attention until the task was done; and provided primary care for his young, twin sons. Tr. 40–41, 248, 252. Mr. Goodman also traveled for a Seattle internship with the FBI. Tr. 40–41, 546, 682, 861.

Contrary to Mr. Goodman's assertion, the ALJ considered the combined effects of all of Mr. Goodman's medical conditions but declined to find them to be debilitating because of the medical record, his extensive daily activities, the lack of need for pain medication, and the absence of mental-health treatment. *See* Tr. 28–41. The Court finds that the ALJ cited persuasive, specific, valid reasons for discounting the VA's disability determination that are

supported by the record and did not harmfully err by declining to assess RFC in the same way the VA did in making its determination of disability.

### 3. GAF Score

Mr. Goodman contends that the ALJ harmfully erred by summarily rejecting the VA's assigned GAF score of 53, which would indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). The Court disagrees.

The ALJ gave little weight to the GAF score because the American Psychiatric Association, which created the GAF score system, no longer endorses the use of GAF scores due to the system's inherent limitations; the GAF scale never had a direct correlation to the severity requirements in the mental disorders Listings under the Social Security Act; and the SSA has rejected the GAF score as a method of evaluating the severity of impairments. Tr. 30 & n.1; *see* American Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013) ("DSM-V"); *McFarland v. Astrue*, 288 Fed. Appx. 357, 359 (9th Cir. 2008); 65 Fed Reg. 50746, 50764–65 (Aug. 21, 2000). To the extent the ALJ erred by determining that the VA's assigned GAF score was *per se* unreliable, the Court finds the error to be harmless. Mr. Goodman fails to identify how giving weight to the VA's assigned GAF score would have altered the ALJ's RFC assessment. The RFC assessment limited Mr. Goodman to occasional public contact, and throughout the decision the ALJ evaluated the functional impact of Mr. Goodman's mental impairments in greater detail than can be expressed in a GAF score of 53.

The ALJ did not harmfully err by giving little weight to the VA's assigned GAF score.

ORDER AFFIRMING THE COMMISSIONER'S DECISION AND
DISMISSING THE CASE WITH PREJUDICE - 10

### 4. Ms. Goodman's Lay Testimony

Mr. Goodman argues that the ALJ harmfully erred by ignoring his wife's first lay statement and by failing to mention what weight was given to either of his wife's lay statements. The Court disagrees.

An ALJ must provide a germane reason to discount the testimony of a lay witness. *Dodrill v. Shalala*, 12 F.3d 915, 918–919. Although the ALJ did not state explicitly that she was rejecting or discounting Ms. Goodman's testimony, her discussion of Ms. Goodman's statements in the context of finding only a mild restriction in the activities of daily living demonstrates that she found the statements to be internally inconsistent and inconsistent with the balance of the record. *See* Tr. 32, 38.

First, contrary to Mr. Goodman's assertion, the ALJ considered his wife's first lay statement in 2015 (cited as Exhibit 10E), compared it to the second lay statement in 2016 (cited as Exhibit 19E), found the two statements to be inconsistent, and suggested only a mild restriction to activities of daily living:

> In activities of daily living, the claimant has mild restriction. The claimant's wife, Peggy, wrote that the claimant did little things to straighten up the bathrooms, played with their two boys, swept and mopped the floors, attended church. She said he could no longer play softball or golf. **(Exhibit 19E/1)**. However, she also listed golf as one of the claimant's hobbies **(Exhibit 10E/5)**. He cleaned up after his dogs and provided care for his wife and children. She also indicated that he needed help to dress, bathe, and use the toilet **(Exhibit 10E/2)**. She did indicate that he drove a car, went out alone, shopped in stores, shopped by computer, and managed finances **(Exhibit 10E/3-4)**. She also provided a third-party function report, dated October 22, 2015 where she said the claimant's pain, anxiety, depression, and lack of sleep limited his ability to work **(Exhibit 10E/1)**. On her third party function report, the claimant's wife stated that the claimant spent time with others, showed affection and communicated daily. He attended a small bible study group at church regularly. However, she believed that the claimant had a problem getting along with others because his PTSD symptoms paralyzed him with anxiety and anger. She said he did not go out as much anymore.

Tr. 32 (emphasis added). Second, in the discussion following the ALJ's evaluation of Ms. Goodman's statements, the ALJ referred to medical evidence that supported only a mild restriction to activities of daily living and to medical and other evidence that showed moderate difficulties in social functioning and concentration, persistence, or pace. Tr. 32–33.

Thus, to the extent the ALJ erred by failing to explicitly state a germane reason for discounting Ms. Goodman's lay testimony, that error was harmless. The ALJ considered his wife's lay statements and accepted them only to the extent they supported a mild restriction in the activities of daily living. Tr. 32–33. The ALJ accepted in-part Ms. Goodman's lay testimony about social difficulties by limiting Mr. Goodman to occasional public contact in the RFC assessment. *See* Tr. 34. Moreover, Ms. Goodman's lay testimony is duplicative of Mr. Goodman's own testimony about his limitations. Mr. Goodman does not challenge the ALJ's reasons for discrediting his personal testimony about symptoms.

The Court finds that the ALJ did not harmfully err in her treatment of Ms. Goodman's lay testimony.

**5. Non-Examining Dr. Platter's Assessment of Physical RFC**

Mr. Goodman contends that the ALJ erred by failing to explain adequately why non-examining physician Dr. Platter's physical RFC assessment was discounted. The Court disagrees.

Non-examining physician Dr. Platter opined that Mr. Goodman had the physical RFC to perform what amounts to sedentary work: lifting/carrying 10 pounds occasionally, less than 10 pounds frequently; standing/walking 2 hours out of an 8 hour day; and sitting for 6 of 8 hours. Tr. 108. The ALJ gave partial weight to this opinion because Mr. Goodman's "activities of daily

living, his work attempts, and his limited use of medication show that [he] is capable of performing light exertion." Tr. 38.

An ALJ may reject the opinion of a non-examining physician by referring to specific evidence in the medical record. Throughout the decision, the ALJ referred to specific evidence of: Mr. Goodman's extensive physical activity, such as golfing and providing primary care for his twins; work attempts in which he was not physically limited; and Mr. Goodman's choice, after detoxing from opioids, not to use pain medication during much of the relevant period. Tr. 34–41. For example, at the hearing Mr. Goodman testified that he had "no physical issues" with his work hauling fuel for Harris Trucking and left his position driving for H and E based on non-physical issues. Tr. 66. Moreover, in the position he took at the Rescue Mission that marked the end of the relevant period in June 2016, i.e., five months after Dr. Platter rendered his opinion, Mr. Goodman testified that he was lifting "a few" boxes of paper, each weighing about 50 pounds, and that he was generally engaged in "[w]arehouse work" involving "pushing carts, lifting pallets of pallet jacks, moving them around." Tr. 77.

The ALJ did not harmfully err by discounting non-examining physician Dr. Platter's physical RFC assessment.

### 6. Hypotheticals Posed to VE

Mr. Goodman contends that the ALJ erred at step five by posing questions to the VE that were deficient because they did not include all of his limitations, such as an inability to work consistently due to medical appointments or the limitations considered in the VA's disability determination. Because Mr. Goodman has failed to demonstrate that the ALJ erred in assessing RFC, the Court rejects Mr. Goodman's contention that the hypotheticals posed to the VE were deficient based on an inaccurate RFC assessment.

### 7. VE's Job Numbers

Mr. Goodman argues that the ALJ's step five finding was not supported by the evidence because the VE testified to job numbers that have been contradicted by evidence presented to the Appeals Council. The Court disagrees.

At the hearing, the VE testified that a person with Mr. Goodman's assessed RFC could perform three light work jobs: production assembler, DOT 706.687-010, 20,570 jobs nationally and 348 jobs in the state of Washington; assembler, electrical accessories, DOT 729.687-010, 42,068 jobs nationally and 837 in Washington; and cleaner, housekeeping, DOT 323.687-014, 76,968 jobs nationally and 1,377 jobs in Washington. Tr. 79. Although Mr. Goodman did not object to the VE's qualifications or to the VE's job-numbers testimony, he submitted to the Appeals Council a sworn declaration by a private VE, Joseph A. Moisan, Ed. D., that the job numbers were incorrect with respect to two of the three jobs: production assembler and assembler, electrical accessories. Dkt. 10, at 20–37. Dr. Moisan attacked the hearing VE's methodology and stated the following job numbers: production assembler, 677 jobs nationally and 7 jobs in the state of Washington; assembler, electrical accessories, 270 jobs nationally and 3 in Washington; and the same numbers as the VE for cleaner, housekeeping. Dkt. 10, at 29. According to Dr. Moisan, only the job of cleaner, housekeeping existed in significant numbers; however, cleaners, housekeeping are required to be on their feet the entire time they are working, well beyond the six-hour limit for work at the light exertional level. *Id.* The Appeals Council considered Dr. Moisan's declaration but found it was not relevant to Mr. Goodman's claim for disability. Tr. 2.

The Commissioner argues that the Court need not consider Dr. Moisan's testimony because it was reasonable for the ALJ to accept as substantial evidence VE testimony that was

never challenged until after the hearing was over. Dkt. 11, at 8. That is, the Commissioner implicitly argues that "when a claimant fails entirely to challenge a vocational expert's job numbers during administrative proceedings before the agency, the claimant waives such a challenge on appeal." *Shaibi v. Berryhill*, __ F.3d __, 2017 WL 3598085, at *6 (9th Cir. Aug. 22, 2017). Mr. Goodman responds that he was deprived of the opportunity to object at the hearing because the ALJ did not respond to a pre-hearing request for a subpoena duces tecum that would have allowed him to scrutinize the information on which the VE relied. Dkt. 12, at 8.

The Court finds the holding of *Shaibi* to be inapplicable here because Mr. Goodman challenged the VE's testimony "during administrative proceedings," and the Appeals Council considered but substantively rejected Dr. Moisan's testimony. Generally, when a VE's testimony on job numbers conflicts with the Medical-Vocational Guidelines, the ALJ must "clarif[y] and develop[] the record." *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989). The vast discrepancy between the VE's job numbers for two of the three positions and those tendered by Dr. Moisan are too striking to be ignored and would warrant a remand under different circumstances. *See, e.g.*, *Buck v. Berryhill*, __ F.3d __, 2017 WL 3862450 (Sept. 5, 2017). Here, however, the Commissioner's failure to reconcile the conflict between the VE's hearing testimony and Dr. Moisan's testimony is harmless because the parties *agree* about the job numbers for a cleaner, housekeeping, DOT 323.687-014, and disagree only on the question of whether the position constitutes "light work." Dr. Moisan provided no support for his conclusion that, contrary to the DOT definition, the position of cleaner, housekeeping DOT 323.687-014 entails more than light work.

In assessing RFC, the ALJ stated that Mr. Goodman could perform "**light work** as defined in 20 CFR 404.1567(b)." Tr. 34 (emphasis added). The description for DOT 323.687-

014 cleaner, housekeeping provides that this job involves **light work**. *See* DOT 323.687-014, 1991 WL 672783. "The [DOT] descriptions can be relied upon—for jobs that are listed in the DOT—to define the job as it is usually performed in the national economy." SSR 82–61, 1982 WL 31387, at *2 (Jan. 1, 1982). Without acknowledging that the DOT defines cleaner, housekeeping DOT 323.687-014 as "light work," Dr. Moisan opined that the job cannot be light work because the position requires being on one's feet for the entire workday instead of only 6 out of 8 hours. Dkt. 10, at 29. The Court may accept Dr. Moisan's opinion that contradicts the DOT definition only if the record contains "persuasive evidence to support the deviation." *Pinto v. Massanari*, 249 F.3d 840, 846 (9th Cir. 2001) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995)); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008) (finding error when "ALJ did not identify what aspect of the VE's experience warranted deviation from the DOT"). Dr. Moisan provided *no* evidence to support his claim that the DOT was wrong to classify DOT 323.687-014 as light work, let alone *persuasive* evidence. Although Dr. Moisan suggested that the RFC was deficient because it failed to include a restriction to standing/walking 6 out of 8 hours, Dkt. 10, at 29, such a restriction is part and parcel of the definition of "light work." Social Security Ruling 83-2 provides that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-2.[4] In sum, Dr. Moisan did not support his bald assertion that, contrary to the DOT definition, the job of cleaner, housekeeping DOT 323.687-014 entails more than light work, and is incorrect

---

[4] Social Security Rulings constitute Social Security Administration interpretations of the statute it administers and of its own regulations. Accordingly, the courts defer to Social Security Rulings unless they are plainly erroneous or inconsistent with the Act or regulations. *See Quang van Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

that an RFC for "light work" fails to acknowledge a restriction to standing or walking for 6 hours in an 8-hour workday.[5]

The ALJ did not harmfully err by relying on the VE's testimony that Mr. Goodman could perform the requirements of a light-work job that exists in substantial numbers in the national economy: cleaner, housekeeping DOT 323.687-014.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED** and this case is **DISMISSED** with prejudice.

DATED this 25th day of September, 2017.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

---

[5] Because Dr. Moisan did not in any way explicate the job duties of the light-work position of cleaner, housekeeping DOT 323.687-014 (aka "maid"), it is impossible to determine whether he may have conflated that position with the heavy-work position of housecleaner DOT 323.687-018. *See, e.g.*, *Perdomo v. Berryhill*, 2017 WL 2636035, at *5–*7 (S.D. Cal. June 19, 2017).

ORDER AFFIRMING THE COMMISSIONER'S DECISION AND
DISMISSING THE CASE WITH PREJUDICE - 17